UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RHONDA NOTTINGHAM,

       Plaintiff,                                        Hon. Paul L. Maloney

v.                                                        Case No. 1:08-CV-157

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/


**REPORT AND RECOMMENDATION**

       This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

       Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 41 years of age at the time of the ALJ's decision. (Tr. 22, 44). She possesses a General Equivalency Diploma (GED) and worked previously as a certified nurse's aide, care provider, and waitress. (Tr. 60, 68-71).

Plaintiff applied for benefits on January 20, 2004, alleging that she had been disabled since September 1, 2000, due to a right ankle impairment and depression. (Tr. 44-46, 54, 76, 316-18). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 25-43, 319-23, 328-52). On February 15, 2006, Plaintiff appeared before ALJ Janice Bruning, with testimony being offered by Plaintiff and vocational expert, Randall Nelson. (Tr. 468-93).

In a written decision dated June 20, 2006, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 16-22). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 7-10). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2005. (Tr. 16); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social

Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status.  *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

PHYSICAL IMPAIRMENTS

On August 25, 2000, Plaintiff reported to the emergency room.  (Tr. 157-58). Plaintiff reported that she hurt her right ankle in a recent fight.  (Tr. 157).  X-rays revealed that Plaintiff had suffered a non-displaced ankle fracture.  (Tr. 158, 161).  X-rays of Plaintiff's right ankle, taken on January 9, 2001, revealed that Plaintiff's fracture was "healing."  (Tr. 244).  X-rays of Plaintiff's right ankle, taken on October 9, 2002, were "unremarkable" with no evidence of fracture, dislocation, or misalignment.  (Tr. 189).

X-rays of Plaintiff's right knee, taken on January 23, 2003, were "unremarkable" with no evidence of fracture, dislocation, joint effusion, or arthritic change.  (Tr. 188).  X-rays of Plaintiff's right ankle, taken the same day, revealed "some mild deformity of the distal right fibula having the appearance of an old healed fracture."  (Tr. 187).  There was no evidence, however, of fracture, dislocation, or misalignment.  (Tr. 187).

X-rays of Plaintiff's right foot and ankle, taken on December 27, 2003, revealed no evidence of fracture.  (Tr. 245-46).

MENTAL IMPAIRMENTS

On November 23, 2000, Plaintiff "had some type of conflict with her boyfriend and was threatening to jump off [a] bridge."  (Tr. 165).  Plaintiff was detained by the police and taken

to a hospital where she was admitted for treatment. (Tr. 165). Plaintiff was discharged on November 25, 2000. (Tr. 163). Plaintiff was diagnosed with "adjustment disorder with disturbance of emotion and conduct" and her GAF score was rated as 65-70.[1] (Tr. 163).

On October 4, 2002, Plaintiff was involuntarily admitted to the hospital after she "admitted to taking some type of illegal drug and then saying that she had talked to Jesus all night and God said to hurt somebody." (Tr. 183, 185). Plaintiff reported that she was sad, depressed, overwhelmed, and confused. (Tr. 184). She reported that she "broke up" with her boyfriend the previous day. (Tr. 183). Plaintiff reported that "she was drinking every day for the past year and a half until [two days ago] when she poured it down the drain." (Tr. 183). Plaintiff also reported that she a "history of extensive drug use." (Tr. 183). Plaintiff appeared "a bit spacy," but exhibited no evidence of delusional ideations. (Tr. 184). Plaintiff was diagnosed with psychosis, depression, and alcohol dependence. (Tr. 184). Her GAF score was rated as 36.[2] (Tr. 184). The doctor noted that Plaintiff needed to resume her prescribed medication, but that she first needed to get "detoxed from alcohol." (Tr. 184). After getting "detoxified," and having her medications adjusted, Plaintiff was discharged on October 11, 2002. (Tr. 182).

Treatment notes dated December 3, 2002, reveal that Plaintiff had "stopped taking her medication." (Tr. 201). Plaintiff reported that she "doesn't want medication anymore." (Tr. 201).

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A score of 65-70 indicates that the individual is experiencing "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

[2] A GAF score of 36 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

On January 31, 2003, Plaintiff was admitted to the hospital after "threatening suicide and showing confusion in her thinking." (Tr. 180). Upon admission, Plaintiff exhibited "mild incoherence" and "poor attention span." (Tr. 181). Plaintiff admitted being depressed but denied suicidal ideation. (Tr. 181). Plaintiff participated in a drug screen, the results of which revealed an alcohol level of "less than 0.01," but was "positive for THC." (Tr. 180). Plaintiff responded well to treatment and was discharged on February 21, 2003. (Tr. 173). At discharge, Plaintiff was diagnosed with (1) major depressive disorder, recurrent, severe with psychotic features; (2) alcohol dependence, chronic and continuous; and (3) polysubstance abuse. (Tr. 173). Her GAF score was rated as 40.[3] (Tr. 174).

On March 12, 2003, Plaintiff began participating in counseling at the Ozark Center. (Tr. 210). Plaintiff reported that she was taking her medication and felt "stable." (Tr. 200). Plaintiff's mood was described as "bright [and] pleasant" with no evidence of paranoia, psychosis, anger, or irritability. (Tr. 200).

Plaintiff participated in eight sessions between March 12, 2003 and March 24, 2003. (Tr. 207-10). Treatment notes dated March 25, 2003, reveal that Plaintiff "became intoxicated" the previous evening. (Tr. 207). Plaintiff asserted that "drinking is not a problem with her." (Tr. 207). Treatment notes dated March 28, 2003, indicate that Plaintiff became upset when it was suggested that she participate in a substance abuse program. (Tr. 206). Plaintiff asserted that "she does not have a problem with alcohol." (Tr. 206). Plaintiff discontinued treatment at the Ozark Center on April 16, 2003. (Tr. 203-05).

---

[3] A GAF score of 40 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.

On April 1, 2003, C. Kenneth Bowles, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 116-30). The doctor observed that Plaintiff experienced "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." (Tr. 124). Determining that Plaintiff suffered from major depression, and inflexible and maladaptive personality traits, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) and Section 12.08 (Personality Disorders) of the Listing of Impairments. (Tr. 117-25). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 126). Specifically, the doctor concluded that Plaintiff experienced no restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 126). Dr. Bowles concluded that Plaintiff's "impairments [are] not severe." (Tr. 128).

Treatment notes dated August 13, 2003, reveal that Plaintiff was "stable" and "doing well." (Tr. 198). Plaintiff was instructed to continue taking her medication. (Tr. 198). Treatment notes dated November 12, 2003, reveal that Plaintiff was "stable" and that her depression had decreased. (Tr. 197).

On December 10, 2003, Plaintiff was admitted to the hospital due to "agitation and symptoms of an acute psychotic episode." (Tr. 212). Treatment notes indicate that Plaintiff had "not been complaint with her medications at least part of the time prior to admission." (Tr. 212). A drug screen was also positive for THC. (Tr. 214). Plaintiff resumed taking her medication after which Plaintiff's condition improved. (Tr. 212-15). Plaintiff was discharged on January 5, 2004, at which

point her symptoms were "under good control." (Tr. 212-13). Plaintiff was diagnosed with schizoaffective disorder and her GAF score was rated as 52.[4] (Tr. 212).

On September 28, 2004, Plaintiff began participating in counseling at Touchstone Innovare. (Tr. 312-13). Plaintiff was "oriented and cooperative with an appropriate affect" and "no clear signs of depression." (Tr. 312). Plaintiff recognized the importance of taking her medication as prescribed. (Tr. 313). Her GAF score was rated as 50.[5] (Tr. 312).

Treatment notes dated October 5, 2004, reveal that Plaintiff was "doing fine and is taking her medication every day." (Tr. 307). Treatment notes dated October 13, 2004, reveal that Plaintiff's thoughts were "clear and focused." (Tr. 304). Plaintiff reported that "she has not worked since 2000 but thinks she could handle a cashiering job." (Tr. 304). On October 26, 2004, Plaintiff reported that she was taking her medication and had submitted multiple job applications. (Tr. 302).

Treatment notes dated November 23, 2004, reveal that Plaintiff's affect was "bright with appropriate and adequate fluctuations" and her "speech pattern was fluent, spontaneous, and goal-directed." (Tr. 296). Plaintiff exhibited no evidence of depression or anxiety and she was instructed to continue taking her medication. (Tr. 296). On November 29, 2004, Plaintiff reported that she was "taking her medication as prescribed and feels that her symptoms are being managed well." (Tr. 294). Plaintiff reported that she was presently looking for work. (Tr. 294).

---

[4] A GAF score of 52 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

[5] A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

On January 25, 2005, Plaintiff reported that she was presently working part-time at McDonald's. (Tr. 287). Plaintiff stated that she was "happy" to be working. (Tr. 287). On January 28, 2005, Plaintiff reported that she was working 12-20 hours weekly. (Tr. 284).

Treatment notes dated March 3, 2005, reveal that Plaintiff was doing "fine." (Tr. 279). She was "pleasant, friendly, and cooperative" and her affect was "bright with appropriate and adequate fluctuations." (Tr. 279). Plaintiff reported that she was taking her medications as prescribed. (Tr. 279). The examining doctor reported that Plaintiff's schizoaffective disorder was "in stable clinical remission." (Tr. 279).

On June 9, 2005, Plaintiff reported that she was taking her medications as directed and that "everything is okay." (Tr. 273). Plaintiff reported that she was no longer working at McDonald's because "she was not getting that many hours and she was having a problem with transportation." (Tr. 272). Treatment notes dated September 9, 2005, reveal that Plaintiff's condition was "fairly stable." (Tr. 261). On December 5, 2005, Plaintiff reported that she was "doing quite well." (Tr. 255). She indicated that "her mood is good, her medications are working well, and she has no side effects." (Tr. 255).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[6] If the Commissioner can make a

---

[6] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) right ankle fracture with deformity; (2) depression with schizoaffective disorder presentation; (3) personality disorder; and (4) history of alcohol abuse. (Tr. 18). The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 19). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 21-22). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

---

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can occasionally lift/carry 20 pounds; (2) she can frequently lift/carry 10 pounds; (3) she can stand and/or walk at least 6 hours during an 8-hour workday; (4) she can sit for at least 6 hours during an 8-hour workday; (5) she can frequently climb, balance, stoop, kneel, and crawl; (6) she can occasionally crouch; (7) she must avoid concentrated exposure to extreme cold and vibration; (8) she can perform only 1-2 step tasks; and (9) she can occasionally have contact with the public, co-workers, and supervisors. (Tr. 19). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Randall Nelson.

The vocational expert testified that there existed approximately 17,500 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 490-91). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold). The vocational expert also testified that if Plaintiff were further limited in that she could only occasionally climb, balance, stoop, crouch, kneel, and crawl, and also required a sit-stand option, that there existed approximately 5,000 jobs in the state of Michigan which Plaintiff could perform. (Tr. 491).

      a. The ALJ Properly Assessed the Medical Evidence

Plaintiff asserts that "the ALJ committed reversible error by failing to give the proper weight to the opinion of the treating physicians in this case." Plaintiff argues that her various GAF scores indicate that she "had a very serious mental impairment in the opinion of her treating psychiatrists." (Dkt. #8 at 11). Aside from this unobjectionable statement, which is completely consistent with the ALJ's decision, Plaintiff has failed to identify a single medical opinion that the ALJ allegedly failed to properly evaluate.

As Defendant asserts, GAF scores do not constitute medical opinions. While the Court must generally defer to the medical opinions expressed by a claimant's care providers, *see King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984), the ALJ is not required "to put stock in a GAF score in the first place." *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 511 (6th Cir., Feb. 9, 2006) (citing *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002)). Thus, Plaintiff's claim fails because she has failed to identify any medical opinion to which the ALJ failed to properly defer. Moreover, to the extent that Plaintiff's argument is interpreted as instead challenging the ALJ's RFC determination, the result is the same. The medical evidence detailed above reveals that when Plaintiff takes her medication as directed and does not abuse alcohol, she functions at a level consistent with the ALJ's RFC determination.

      b. The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy her burden through the use of hypothetical questions posed to

a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 17,500 such jobs.  Because there was nothing improper or incomplete about the hypothetical questions she posed to the vocational expert, the ALJ properly relied upon his response thereto.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  January 7, 2009                                   /s/ Ellen S. Carmody                
                                                                       ELLEN S. CARMODY
                                                                       United States Magistrate Judge